# Third District Court of Appeal

## State of Florida

Opinion filed February 11, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-1462
Lower Tribunal No. 14-10498
_____

## Paul Marolf and Lizette Marolf,
Appellants,

vs.

## Miami-Dade County,
Appellee.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, Jerald Bagley, Judge.

Jose M. Quiñon; Berrio & Berrio and Juan D. Berrio, for appellants.

Judith Levine, for appellee.

Before ROTHENBERG, EMAS and FERNANDEZ, JJ.

EMAS, J.

Paul and Lizette Marolf (collectively "Marolf") appeal an order finding probable cause for Miami-Dade County ("the County") to maintain a forfeiture action against their property, specifically $197,016 in cash which was found in a safe located in Marolf's home. We conclude there exists probable cause that the currency was "used in the course of, intended to be used in the course of, derived from, or realized through" racketeering activity, see sections 895.01-895.05, Florida Statutes (2014), and is therefore subject to further civil forfeiture proceedings under the Florida Contraband Forfeiture Act.

## I. FACTUAL BACKGROUND:

On March 27, 2014, Paul Marolf was arrested by Miami-Dade police officers at his home. At the same time, the police executed a search warrant at the Marolf home and seized several items, including a 2010 Toyota Tundra vehicle and $197,016 in cash that was found in a safe following its detection by a "currency dog." Paul Marolf was charged with Racketeering, Conspiracy to Commit Racketeering, and six counts of Dealing in Stolen Property.

On May 12, 2014 the County, through the Miami-Dade Police Department, ("the Department") filed a complaint seeking forfeiture of all the items seized at the Marolf home on the night Mr. Marolf was arrested.[1] The Complaint alleged the

---

[1] In addition to the 2010 Toyota Tundra and the $197,016, police seized jewelry, collectible coins and bottles of wine. At the conclusion of the adversarial preliminary hearing, the Department voluntarily dismissed that portion of the Complaint seeking forfeiture of the jewelry, coins and wine. The trial court

2

details of a long-term investigation into the theft and fencing of over-the-counter medications and health and beauty supplies stolen from Walgreens, CVS and Publix stores throughout the State of Florida. It alleged, inter alia, that several suspects would meet weekly at the Marolf home for the sale and purchase of these stolen goods; that Mr. Marolf received, in cash, a percentage of the sales proceeds for facilitating these transactions; and that Mr. Marolf would himself purchase and re-sell stolen goods, using cash proceeds from his prior sales (or cash received from the facilitation of prior sales) to fund subsequent purchases of stolen goods.

The Complaint alleged in Count I that the currency was an "instrumentality" which was used or attempted to be used in the commission of a felony and that, pursuant to the Florida Contraband Forfeiture Act, the seized items were contraband and therefore subject to forfeiture. The Complaint alleged in Count II that that the currency represented proceeds from a violation of Chapter 895, The Florida RICO[2] Act, and that because the currency was used or intended to be used in the course of, or was derived from or realized through, racketeering conduct in violation of sections 895.01-891.05, Florida Statutes (2014), it was subject to forfeiture.

thereafter found probable cause for the forfeiture of the $197,016 and the 2010 Toyota Tundra. However, Marolf appeals the finding of probable cause only as to the $197,016.

[2] Racketeer Influenced and Corrupt Organization.

## II. THE ADVERSARIAL PRELIMINARY HEARING

An adversarial preliminary hearing was held. At the hearing, Detectives Miguel Garcia and Romelio Martinez testified to the underlying investigation and subsequent seizure:

Detective Garcia testified that the investigation into the stolen goods organization began when a confidential informant notified police, provided information about the ongoing illegal activity, and directed them to the Marolf home. An individual identified as Suzanne Mitchell was observed buying stolen merchandise from a "fence" in Ocala and then coming to Marolf's home in Miami to sell the stolen goods to another fence identified as Howard Katz. Mr. Marolf had introduced Ms. Mitchell to Mr. Katz, and Mr. Marolf received a percentage (two percent) of the sales for his own role in facilitating the transactions. Ms. Mitchell and her husband together made over $1.3 million from selling stolen goods to Mr. Katz. Additionally, the police investigation made "controlled buys" and utilized a confidential informant and another fence going on a "stealing spree" in which the fence stole certain items specifically requested by Mr. Marolf, who would then pay for these items by leaving money in his Toyota Tundra. The fence would take the money, leave the stolen goods in the Tundra, and lock the vehicle. Mr. Marolf and his son were then observed removing the stolen goods from the Tundra, and later selling them to Katz. Police conducted surveillance and

videotaped transactions occurring on multiple occasions, and in a similar fashion, over a period of more than a year.

Detective Martinez testified that "Marolf was involved in this organization [the stolen goods ring], which there were transactions that would take place at his residence. And shortly after those transactions . . . Mitchell . . . would then be followed by the detectives to a nearby bank, where she would presumably make some kind of a cash withdrawal, and then she would be seen leaving an envelope in Mr. Marolf's residence or in his vehicle." Detective Martinez testified that he had been instructed that "because of the way his transactions were conducted, that there may be cash inside the residence that I was instructed to seize. . . ."

The police obtained a search warrant and went to the Marolf home to execute the warrant. Upon arrival, police asked Mr. Marolf if there was a safe in the house, and he said there was not. However, Mrs. Marolf told police there was a safe in the house and told police where it was located. A currency dog alerted to the safe. Mr. Marolf initially refused to give police the combination to the safe, but eventually did so when a locksmith was brought in to breach the safe. After the safe was opened, police found a large sum of U.S. currency.[3] Mr. Marolf was asked whether he lied to police about the safe because of the amount of money that was in there; Mr. Marolf said "yes," but stated that most of the money was from

---

[3] The denominations of the currency were comprised almost exclusively of $100 bills (1,890) and $50 bills (160).

when he sold his mother's jewelry following her death.[4]  At the police station, Mr. Marolf admitted that he did business with Mr. Katz and Ms. Mitchell, but denied knowing anything about stolen goods.  He did admit that Ms. Mitchell would leave him cash in an envelope, but said "she probably did that because she likes me and I'm a nice guy."  The investigation uncovered no bank account in Marolf's name that would account for or establish the origin of the money found in the safe.

The trial court found probable cause for the seizure of the $197,016.  We review *de novo* the issue raised on appeal.  Gomez v. Village of Pinecrest, 17 So. 3d 322, 325 (Fla. 3d DCA 2009).

### III.  ANALYSIS

Marolf's primary argument is that the evidence presented at the hearing failed to establish probable cause because the currency does not meet the definition of "contraband article" or "instrumentality" under the Florida Contraband Forfeiture Act, sections 932.701-932.706, Florida Statutes (2014).

### A.  COUNT I (THE FLORIDA CONTRABAND FORFEITURE ACT)

Under section 932.703(1)(a), "[a]ny contraband article, vessel, motor vehicle, aircraft, other personal property, or real property used in violation of any

---

[4] Detective Martinez described Mrs. Marolf as being "dumbfounded" when police opened the safe.  Mrs. Marolf told Detective Martinez: "I have to sit here every month and figure out how we're going to make ends meet and pay the bills each month.  I don't know how he had all this money and he [Mr. Marolf] didn't tell me about it.  We're struggling every month."

provision of the Florida Contraband Forfeiture Act . . . may be seized and shall be forfeited subject to the provisions of the Florida Contraband Forfeiture Act."

The term "contraband article" is defined in pertinent part as:

> Any personal property, including, but not limited to, any vessel, aircraft, item, object, too, substance, device, weapon, machine, vehicle of any kind, money, securities, books, records, research, negotiable instruments, or currency, which was used or was attempted to be used as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony, whether or not comprising an element of the felony, or which is acquired by proceeds obtained as a result of a violation of the Florida Contraband Forfeiture Act.

§ 932.701(2)(a)(5), Fla. Stat. (2014) (emphasis added).

Marolf argues that the Department failed to establish probable cause that the currency seized from the safe in their home "was used or attempted to be used" in the commission of any offense. Rather, Marolf posits, the currency represented at most "mere proceeds" from past sales. Therefore, Marolf contends, the currency does not meet the definition of "contraband article" and is therefore not subject to continued seizure or forfeiture. However, this argument applies only to Count I of the Complaint (forfeiture under the Florida Contraband Forfeiture Act as an "instrumentality" of crime) and is inapplicable to Count II of the Complaint (forfeiture as a civil remedy for violations of The Florida RICO Act).

Count I of the Complaint sought forfeiture of the currency as a "contraband article" under the Florida Contraband Forfeiture Act. That Act created twelve separate categories and definitions of what constitutes a "contraband article." For

7

our purposes, the relevant provision is subsection 932.701(2)(a)(5.) which, as described earlier, defines as a contraband article any "currency, which <u>was used or was attempted to be used</u> as an instrumentality in the commission of, or in aiding and abetting the commission of, any felony. . . ." (Emphasis added).

The Legislature created separate definitions for contraband article in specific circumstances and offenses. For example, and by way of contrast, the Legislature defined "contraband article" for narcotics-related offenses in the following manner:

> Any controlled substance as defined in chapter 893 or any substance, device, paraphernalia, or currency or other means of exchange that was used, was attempted to be used, <u>or was intended to be used</u> in violation of any provision of chapter 893, if the totality of the facts presented by the state is clearly sufficient to meet the state's burden of establishing probable cause to believe that a nexus exists between the article seized and the narcotics activity, whether or not the use of the contraband article can be traced to a specific narcotics transaction.

§932.701(2)(a)(1.) (emphasis added).

As can be seen, the definition of contraband article for narcotics-related offenses is broader, as it includes currency that "was used, was attempted to be used, or <u>was intended to be used</u>" in violation of chapter 893.[5] In other words, the

_____

[5] This broader definition also exists for forfeiture of certain contraband articles related to violations of gambling laws (<u>see</u> § 932.701(2)(a)(2.), providing for forfeiture of "[a]ny gambling paraphernalia, lottery tickets, money, currency, or other means of exchange which was used, was attempted, or intended to be used in violation of the gambling laws of the state"), and to violations of beverage and tobacco laws (<u>see</u> § 932.701(2)(a)(3.), providing for forfeiture of "[a]ny equipment, liquid or solid, which was being used, is being used, was attempted to

8

definition is not only backward-looking (i.e., to the use of currency involving offenses already committed or attempted) but forward-looking as well (i.e., to the use of currency involving offenses intended to be committed). By contrast, the relevant subsection applicable to Count I of the Complaint (section 932.701(2)(a)(5.)), does not include the forward-looking phrase "was intended to be used." It is upon this distinction that Marolf bases his argument that the evidence presented at the adversarial preliminary hearing was insufficient, establishing (if anything) that the currency "was intended to be used" for the purchase of stolen goods in the future and therefore is not subject to forfeiture under section 932.701(2)(a)(5.). Marolf contends that since it was not shown that the seized currency "was used or attempted to be used" as the actual means by which an offense was committed or attempted, it is not an "instrumentality" and therefore not a "contraband article" subject to forfeiture under section 932.701(2)(a)(5). See Carbajal v. Forfeiture of U.S. Currency $75,781.00, 36 So. 3d 747 (Fla. 3d DCA 2010); Sheriff of Seminole Cnty. v. Oliver, 59 So. 3d 232 (Fla. 5th DCA 2011). While this argument may have merit as far as it goes, it is

---

be used, or intended to be used in violation of the beverage or tobacco laws of the state"). Importantly for our purposes, and as discussed infra, the Legislature created a similarly broad definition of property subject to civil forfeiture under Florida's racketeering statute, and includes within its ambit money which was intended for use in the course of, or which was derived from or realized through, a pattern of racketeering activity. See §895.05(2)(a), Fla. Stat. (2014).

9

ultimately unavailing, given the allegations of Count II of the Complaint and the evidence presented at the adversarial preliminary hearing.

## B.  COUNT II (CIVIL FORFEITURE FOR VIOLATIONS OF THE FLORIDA RICO ACT)

In the instant case, the Complaint did not allege merely that the currency was an "instrumentality" of a crime, nor seek forfeiture based only upon the definition of "contraband article" contained in section 932.701(2)(a)(5). Count II of the Complaint alleged that Mr. Marolf was engaged in a pattern of racketeering activity and an organized scheme involving, inter alia, the ongoing purchase and sale of stolen goods.  The Complaint alleged that the $197,016 represented proceeds realized through, or derived directly or indirectly from, this pattern of racketeering activity, and that the currency was intended to be used in furtherance of this criminal enterprise.  Count II sought forfeiture of the currency pursuant to The Florida RICO Act (sections 895.01-895.06, Florida Statutes (2014)), which provides a civil forfeiture remedy for proceeds derived from a pattern of racketeering activity.  The Florida RICO Act contains the following relevant definitions[6]:

> (1) "Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit:

---

[6] §895.02 Fla. Stat. (2014).

(a) Any crime that is chargeable by petition, indictment, or information under the following provisions of the Florida Statutes:

. . . .

32. Chapter 812, relating to theft, robbery, and related crimes.

. . . .

(4) "Pattern of racketeering activity" means engaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct

Section 895.05(2)(a) provides a forfeiture remedy for violations of the

Florida RICO Act:

All property, real or personal, including money, used in the course of, intended for use in the course of, derived from, or realized through conduct in violation of a provision of ss. 895.01-895.05 is subject to civil forfeiture to the state.

(Emphasis added.)

The evidence presented at the adversarial preliminary hearing established probable cause that the $197,016 represented proceeds from a pattern of racketeering activity; that is, the organized and ongoing scheme to purchase and sell stolen goods, and that the currency was intended for use in the course, was derived from, or was realized through this racketeering conduct. Accordingly, we find no error in the trial court's determination of probable cause.

11

Affirmed.